UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RHEANNA DEAN,

|  |  |  |
|---|---|---|
| | Plaintiff, | Civil Action No. 18-11516 |
| | | Honorable Laurie J. Michelson |
| v. | | Magistrate Judge David R. Grand |

ANDREW SAUL,
COMMISSIONER OF
SOCIAL SECURITY,

Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 21]

Plaintiff Rheanna Dean ("Dean") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #13, #21), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, this Court finds that the Administrative Law Judge's ("ALJ") conclusion that Dean was not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment (**Doc. #21**) be **DENIED**, Dean's

Motion for Summary Judgment (**Doc. #13**) be **GRANTED** and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

## II.   REPORT

### A.   Procedural History

After Dean's application for SSI was denied at the initial level (Tr. 78-81) and on reconsideration (*id.*), she timely requested an administrative hearing, which was held on July 11, 2017, before ALJ Crystal White-Simmons (Tr. 29-54).   Dean, who was represented by non-attorney advocate Sharon Rossiter, testified at the hearing, as did vocational expert James Lozer.   (*Id.*).   On August 30, 2017, ALJ White-Simmons issued an unfavorable written decision.   (Tr. 12-23).   On March 10, 2018, the Appeals Council denied review.   (Tr. 3-8).   Dean timely filed for judicial review of the final decision on May 14, 2018.   (Doc. #1).

### B.   Background

#### 1.   *Dean's Testimony*

Dean's alleged disabling conditions include: "bipolar disorder, autism spectrum disorder, posttraumatic stress disorder, panic disorder without agoraphobia, anxiety disorder, attention deficit hyperactivity disorder, and an organic mental disorder."   (Tr. 14).

Dean alleges disability prior to the age of 22.   (Tr. 179).   Dean was five-

years old as of her alleged onset date of September 1, 2001.  (*Id.*).  As of the date of her application, she was nineteen years old.  (*Id.*).  She graduated from high school, attending general education classes.  (Tr. 35).  She worked briefly in 2014, earning just over $700.00, and then at Arby's in 2016, earning just over $1,200.00 (Tr. 36, 223, 226).  She quit both jobs because the tasks were too complicated, and the pace was too quick.  (Tr. 36).  She also had difficulty getting along with people and struggles with personality conflicts.  (Tr. 36, 46).

Dean testified that she lives with her grandparents and is trying to get a driver's license.  (Tr. 33).  She stated that getting a license is "complicated" for her due to her sensitivities to the environment.  (*Id.*).  Her grandmother is her primary source of transportation, although she attempts the bus once a month.  (Tr. 33-34).

She also testified that she is seeing a psychiatrist monthly and a therapist twice a month at Community Care Services ("CCS").  (Tr. 38-39).  At the time of the hearing, she was compliant with medications, but they made her drowsy.  (Tr. 39).  She has difficulties with her medications because each one's effectiveness changes over time, and her doctors are constantly changing them.  (Tr. 43).  She has trouble remembering when to take them but has been trying to use an alarm on her phone.  (Tr. 45).  She spends her day in her room, helps her grandma with simple tasks, and visits with her daughter when "someone brings her over to [her] grandmother's house."  (Tr. 49-50.).

Dean's mother has custody of her two-year-old daughter because she could not take care of the baby and provide for her.  (*Id*.).  Dean attempted suicide twice – once in April of 2013 and once in October of 2015.  (Tr. 42.).

### 3.   *The Relevant Medical Evidence*

The earliest medical evidence in the record is from licensed psychologist, Dr. Andrew Maltz, Ph.D., on May 30, 2014. (Tr. 352-59).  The Special Services Director of Lincoln Park Public Schools referred Dean to Dr. Maltz for an evaluation for special education services during her senior year of high school. (Tr. 352).  Dr. Maltz noted that Dean had a history of bipolar disorder and had already been on several medications including:   Trileptal, Effexor, Lithium, Adderall, Remeron and Concerta.    (Tr. 354).    Dr. Maltz administered a comprehensive evaluation and concluded that Dean met the special education criteria for certification as "autistically impaired."  (Tr. 357).  On the Vineland Adaptive Behavior Scales, Dean measured an age equivalent of seven years and four months old for communication, nine years and eight months for daily living skills, and eight years and 11 months old for socialization.  (Tr. 356).  Dr. Maltz noted that "[t]here was a clear discrepancy between her cognitive levels and her adaptive functions."  (*Id*.).  He went on to state that "[t]his discrepancy is not atypical in individuals with Autism since they have problems applying their cognitive abilities to daily living expectations."  (*Id*.).  He specifically expressed

concerns about Dean's adaptive and social skills:

> Rheanna will have difficulty applying her cognitive abilities to daily living. She is very vulnerable. She is naïve and she will be prone to being taken advantage of. She will be incapable of appreciating the intent of others. She is a well-developed adolescent who will fall prey to exploitation by others without an ability to discriminate. Her social development levels are falling in the latency years, far below her chronological and what may be expected given her cognitive levels. Consequently, she may appear more sophisticated and capable than is true.

(Tr. 357).

On September 2, 2014, Dean visited Dr. Susan Youngs, M.D. (Tr. 361-64). Dr. Youngs confirmed Dr. Maltz's diagnosis and listed her clinical impressions of Dean to include: sensory processing dysfunction, attention deficit disorder of childhood, social pragmatic speech disorder and emotion disturbance of childhood or adolescence. (Tr. 361). Dr. Youngs discussed getting Dean community mental health services. (Tr. 361).

Consequently, on March 18, 2015, Dean completed an intake assessment with CCS. (Tr. 542- 63). She listed her presenting problems as Asperger's. She also stated that she was taking Effexor and Trileptal. (Tr. 542).

On May 4, 2015, Dean completed a psychiatric evaluation with Dr. Bardia Gholami, M.D. of CCS. (Tr. 537). Dean was a bit more detailed about her health history on this date:

> The patient has always had problems with communication,

> stereotypical behavior, restricted interests, had difficulty establishing and maintaining relationships, and tolerating frustration. She was considered to be "bipolar" due to mood swings. She also has problems maintaining attention and completing tasks. Used to cut herself. The patient describes depressive symptoms including: depressed mood or irritable most of the day, nearly every day, decreased interest/pleasure in most activities, poor sleep . . . reduced activity/motivation, fatigue, feeling guilty, feeling worthless, poor concentration, morbid thoughts, and suicidal ideation without a plan.

(Tr. 537).

Dean also told Dr. Gholami of her 2013 suicide attempt that led to an approximately three-week stay at Behavior Crest Center in Detroit. (*Id*.). Dr. Gholami, M.D. recommended continuing Trileptal, tapering off Effexor and starting a stimulant. (Tr. 540).

On May 4, 2015, Dean visited CCS again for a routine appointment. (Tr. 593). She saw Therapist Marway Johnson, MSW, LLMSW. (Tr. 594). She spoke "about her recent fight with her mother and grandmother about her relationship." (*Id*.). This fight was foretelling; when Dean saw Ms. Johnson again on May 18, she was pregnant at age 19. (*Id*.). Ms. Johnson noted that her client "appears to have a very basic to almost vague understanding of what it means to have a child but lacks insight on what it means and the responsibility that comes along with that." (*Id*.).

Dean had a Psychiatric medication review on May 28, 2015. (Tr. 588). At that point she was 13 weeks pregnant. (Tr. 588). Dr. Gholami described Dean as

irritable and anxious (Tr. 589), and wrote the following in the comment section of

the medical record:

> Has been throwing up a lot; she is 13 weeks pregnant, plans to keep baby, is already arguing with the father who is threatening to take the baby away from her due to her mental incapacity since he is worried he will be forced to pay child support. The patient's mother is trying to get guardianship of the patient and her unborn child due to "the mental age of the patient being estimated between 7 to 10 years old in a previous assessment." Complains of anxiety. Stays in her room. Throws up a lot so has not been able to keep the medication consistently, including Abx she needs for a painful cervical infection (possibly STD). Obsessing over the baby's father and is in argument with family who want to press charges against the man on the grounds of the patient not really being able to consent. The baby's father has a fiancé of his own. Grandma complains that it is hard to discuss anything with her since she won't comprehend and also tells the guy everything.

(Tr. 588).

Dean had her baby prematurely in August, at 25 weeks pregnant, via

cesarean section at Covenant Hospital in Saginaw, Michigan. (Tr. 386).

Dean started therapy again at Bay Arenac Behavioral Health at be close to

her daughter, who was in the neonatal intensive care unit at Covenant. (Tr. 481).

Therefore, on September 11, 2015, Dean started therapy with Dr. Manuel Dumlao,

M.D., at Bay Arenac Behavioral Health. (Tr. 473-84). At that point she was four

weeks postpartum. (Tr. 473). Dean reported an "increasingly depressed mood

with severe insomnia, crying spells, poor appetite and weight loss." (*Id.*).

Notably, Dr. Dumlao stated that "[s]he has a sense of hopelessness and thoughts of

suicide on and off.  No plan or intent is present." (*Id.*).

Dr. Dumlao's impression of her mental status was mixed at this examination. (Tr. 474).  In whole, he stated:

> She is alert, anxious and cooperative with this interview.  Her speech was not slurred, and she is articulate and fluent.  No pressure of speech or flight of ideas is noted.  Her affect is flat, depressed, tearful at times, tense and anxious.  She is fully oriented and her recent, remote and immediate recall is good.  Fund of knowledge is good.  Judgement is good.  Insight is fair.  No tremors noted.  No abnormal involuntary movements are noted.

(Tr. 474).

In treatment recommendations, Dr. Dumlao indicated that he "increased her Lexapro and started quetiapine on an upward titration." (Tr. 475).

On October 2, 2015, Dean saw Dr. Dumlao again.  (Tr. 481).  Once again, Dr. Dumlao's report of her mental status was mixed:

> Rheanna reports feeling better overall.  She is feeling less depressed to feeling euthymic.  But she does admit she is quite anxious and worried mostly about her baby who is still in PICU following premature delivery.  Rheanna stays in the hospital courtesy house so she can be with her baby every day.  Conflict continues with her mother.  The patient sees her own irritability, anxiety and stress as primary reasons for the conflict.  Mostly, she admits she takes her anger and worry out on her mother.  Sleep is better.  Motivation drive and interest is better.

(Tr. 481).

Dr. Dumlao recorded Dean's mental status as alert and normal.  (Tr. 481).  He stated that her "[i]nsight and judgement are good." (*Id.*).  He prescribed

8

Escitalopram and Quetiapine Fumarate.  (Tr. 482).

Only eight days later, however, on October 10, 2015, Dean walked into the emergency room at St. Mary's Hospital in Standish, Michigan due to suicidal thoughts.  (Tr. 376).  She told the admitting nurse that she wanted "to kill herself by cutting her veins."  (Tr. 377).  She had a superficial cut on her arm upon her arrival at St. Mary's.  (*Id.*).

St. Mary's admitted Dean to the psychiatric unit for further evaluation and treatment.  (Tr. 414-72).  Dr. Sunil Rangwani, M.D. noted Dean's inappropriate conduct and lack of judgment:

> Of note, at one point during the interview she dips her sweatshirt far enough to reveal significant amount of cleavage. Her speech is slightly rapid and pressured, is of normal volume. She describes her mood as "stressed."  Her affect is somewhat restricted in range.  It is congruent with content of speech, but with muted range of expression.  Her thought process is generally linear.  In terms of thought content, she denies suicidal thoughts currently, but did have them as of yesterday. She denies homicidal thoughts.  She denies perceptual disturbances and does not appear to be responding to internal stimuli.  In terms of insight, she acknowledges the need for mental health treatment and says that she has been engaging in treatment.  Her judgement appears somewhat limited due to impulsivity and difficulty managing emotions.

(Tr. 418).

At one point during her stay, Dr. Rangwani put Dean on Abilify, trazodone and Vistaril in addition to her other medications stated above.  (Tr. 422-23).

On discharge on October 14, 2015, Dr. Rangwani noted that Dean had

improved in the unit:

> Her current medications were continued, and psychotropic medication adjusted to maintain her on minimum therapeutic dose.  She was exposed to individual and group therapy with a focus on stress management, coping skills and safety plan and psychoeducation utilizing cognitive behavioral techniques.  The patient participated well in the program. . .. She was discharged in stable condition.

(Tr. 414).

On October 30, 2015, Dean returned to Dr. Dumlao. (Tr. 477-80).   Dr. Dumlao's mental status exam of Dean was better than last time:

> Rheanna is alert and seems more talkative and spontaneous today.  She still has poor eye contact.  She has goal directed speech and verbalizes no delusions or hallucinations today.  Her affect is full, less tense and is still somewhat anxious.  She does not appear depressed today.  Oriented fully.  Memory and cognition is good.  She reports an improved ability to focus on conversations.  Insight is good.  Judgment is good.

(Tr. 477).

The medical documents show Escitalopram and Quetiapine Fumarate prescribed through October 30, 2015.  (Tr. 478).  Dr. Dumlao additionally prescribed Abilify and Escitalopram.  (*Id.*).

Dean next saw Dr. Dumlao on December 18, 2015.  (Tr. 490).  Her health during the interim had regressed:

> Rheanna states she is not feeling well.  She is stressed by caregiving for her daughter (4-month-old) and dealing with daughter's colic.  She is up frequently at night to feed and clean up her daughter, so her day night cycle is nearly reversed.  She

> has been cutting when she feels highly stressed.   She is
> conflicting with her mother.   She is eating well but is still tired
> and   fatigued.      Rheanna   is   asking   for   more   help
> pharmacologically to stabilize her mood and depression.

(*Id*.).

Although  Dr.  Dumlao  noted  that  Dean  seemed  to  have  good  judgment

despite being anxious and depressed, she was still taking Abilify and Escitalopram

at that time, and Dr. Dumlao increased her doses of those prescriptions.   (*Id*., Tr.

491).

Dean saw Dr. Dumlao again on January 20, 2016 and continued to struggle

to effectively treat her mental health.   Dr. Dumlao decided to discontinue one her

medications because of its side effects:

> Rheanna  admits  discontinuing  Lexapro  2  months  ago.   She  is
> now feeling more depressed and is interested in trying another
> antidepressant. . . . She  is  not  sleeping  very  well.   She  has
> frequent and long awakenings in part because she has to get up
> to take care of her baby. . . . I told Rheanna that any medication
> that can make her sleepy likely will do so when she is in a sleep
> deprived state.   Moving the medication at night might help but
> she already tried this and still was tired during the day.

(Tr. 493).

Dr. Dumlao described Dean's affect as blunted and depressed, but also noted

that her insight, recall and judgment were good.   (*Id*.).   He added Viibryd to Dean's

medication cocktail.   (Tr. 494).

On April 28, 2016, Dean reported discontinuing the Abilify due to its side

effects:

> She reports discontinuing Abilify because it made her tired
> leading to an increased need to nap.  I suspect she is unhappy
> about risking weight gain.  Her appetite has increased, and she
> is worried about weight gain.  I pointed out she gained only 1
> lb. since her last appointment over 2 months ago.  Rheanna also
> complained of difficulty with focus and hope.  She reports
> losing objects and is forgetful generally.

(Tr. 500).

Dr. Dumlao prescribed Bupropion Hydrochloride, Ranitidine HCI and

Viibryd.  (Tr. 502).  But, on June 8, 2016, Dr. Dumlao reported that Dean again

discontinued her medications:

> She discontinued Viibryd because she feels it makes her
> nauseous.  She reports increased conflict with her stepfather and
> other family members.  Rheanna also quit her job before she
> was fired per her report.  She did not get along with a manager
> and she found the job to be difficult.  She admits she was not
> doing the job well.  She is sleeping reasonably well.  Her mood
> has been depressed.  She has crying spells and anxiety attacks.
> She is very unhappy about her life recently.

(Tr. 504).

Again, Dr. Dumlao noted that her insight and judgment were good.  (*Id*.).

He added Risper DAL to her cocktail.  (Tr. 506).  During this appointment, Dean

told Dr. Dumlao that she was moving, and he requested one more medication

review.  (Tr. 507).  According to the medical records, this review did not occur.

At some point around this time, it seems that Dean moved to her mother and

stepfather's home with her daughter.  (Tr. 517, 519).  Consequently, Dean saw new

treaters.  Dr. Timothy Bronson of Ausable Valley Community Mental Health did

an intake assessment on Dean on October 7, 2016.  (Tr. 509).  At that time, she

reported feeling depressed and anxious and in need of medications to control her

mood swings, which, according to her own report, were severe:

> She reports she is sleeping all the time, has a lot of mood
> swings, will burst out screaming and rage, has difficulty
> concentrating on things, stated she has no energy, is eating too
> much, feels depressed, feels useless and has been isolating.  She
> states she is hallucinating, reports that she sees things, people
> and shadows.   She reports she has a lot of anxiety about
> everything and has a hard time letting things go.

(*Id.*).

Also, of note, Dean reported that she had given custody of her daughter to

her mom.  (Tr. 510).  Dr. Bronson reported that her mood was both anxious and

elated, and her thought process was rambling.  (Tr. 512).  He also noted impaired

memory and severely impaired concentration.  (Tr. 513).  He diagnosed her with

bipolar disorder and generalized anxiety disorder.  (Tr. 514).

On October 11, 2016, Dean retuned to Ausable to create a Consumer Plan of

Service.   (Tr. 519).   Dr. Bronson prescribed individual and group outpatient

therapy.  (Tr. 524).  In this plan, Dean stated that she would "like to be able to

interact with parents and others better."  (Tr. 528).

Dean saw Dr. Ali Ibrahim, M.D. at Ausable Valley Community Mental

Health on October 29, 2016 for a medication review.  (Tr. 516).  Dr. Ibrahim

started Dean on BuSpar and Latuda.  (Tr. 518).  Dean saw Dr. Ibrahim again on December 1, 2016.  (Tr. 531).  At that time, Dean continued to complain about anxiety, so he increased her BuSpar to 10 mg.  (*Id*.).  As with Dr. Dumlao, Dr. Ibrahim had mixed reviews of Dean's mental status, stating that her "mood is anxious, affect is labile" but "insight is fair to good."  (*Id*.).

At that same time, Social Worker Caryn Schutte, M.A., L.L.P. completed a medical source statement on Dean.  (Tr. 534-36).  She indicated that Dean had extreme impairments in all the following:  1) Ability to understand and remember simple instruction; 2) Ability to carry out simple instructions; 3) Ability to make judgments on simple work-related decisions; 4) Ability to understand and remember complex instructions; and 5) Ability to make judgments on complex work-related decisions.  (Tr. 534).  She also noted that Dean would be off task more than 20% of the work day.  (Tr. 535).  In addition, she indicated that Dean would have marked impairments in the ability to:  1) Interact with the public; 2) Interact appropriately with supervisors; 3) Interact appropriately with co-workers; and 4) Respond appropriately to usual work situations and to changes in routine work settings.  (Tr. 535).  She also indicated that Dean would miss four or more days a month of work for symptoms from her mental impairment.  (*Id*.).  Schutte noted that Dean was in the "process of finding medications and seeking therapy in an effort to minimize symptoms."  (*Id*.).

Dean moved back with her grandparents and returned to CCS on February 7, 2017.  (Tr. 570-87).  On March 23, 2017, Dr. Gholami completed a psychiatric evaluation.  At that time, she was taking Buspar, Effexor, Latuda and Trileptal. (Tr. 567).  Dean reported feeling "guilt over acquiring STD from the father of the child which she believes has led to early delivery and feels responsible for all the misery her daughter went through after birth."  (Tr. 567).

Dean also saw social worker, Jennifer Gavrila on March 29, 2017.  (Tr. 564). At that time, Ms. Gavrila wrote that Dean "presents to be anxious with tears and dramatic gestures."  (*Id*.).  Ms. Gavrila and Dean drafted a treatment plan together on April 13, 2017.  (Tr. 630-38).  Dean saw Ms. Gavrila again on April 18, 2017. (Tr. 628).  She had a medication review with Dr. Gholami again on April 20, 2017. (Tr. 623-27).  Dr. Gholami continued Dean on Rexulti and BuSpar and started her on alprazolam.  (Tr. 627).  On May 4, 2017, Dean saw social worker Gavrila again. (Tr. 621).  Dean discussed her move from her mother's house to her grandmother's house and how her mother "is making her feel like she abandoned her daughter." (Tr. 622).  Dean had another medication review on May 15, 2017.  (Tr. 618).  Dr. Gholami expressed continued concern about Dean's eating and sleeping and increased her alprazolam.  (Tr. 621).  Dean saw Gavrila again on May 17, 2017 and June 1, 2017. (Tr. 614-16).

On July 5, 2017, Ms. Gavrila completed a medical source statement.  (Tr.

640-42). She indicated that Dean had marked impairments in the following: 1) Ability to understand, remember or apply information; 2) Ability to interact with others; 3) Ability to concentrate, persist or maintain pace; and 4) Ability to adapt or manage oneself. (Tr. 640). She also stated that Dean would be off task more than 20% of the work day. (Tr. 641). She also indicated that Dean hade marked impairments in understanding what to do, concentrating on a task, being able to engage in the task around others, and keeping self-control. (*Id*.). Lastly, she indicated that Dean would miss work four days or more a month due to the symptoms of her disability. (*Id*.).

On January 8, 2016, Dr. Barbara Jones Smith, Ph.D. completed a record review of Dean's disability application. (Tr. 66-69). However, the only medical documents on the record at the time were the records from September 2, 2014 through November 30, 2015 from Dr. Maltz, Dr. Susan Youngs, St. Mary's Hospital, Bay Arenac Behavioral Health and Mid-Michigan Medical Center. (Tr. 68). Therefore, Dr. Jones Smith did not review any of Dean's medical records from November 30, 2015 through July 5, 2017, including the medical source documents from the two social workers. (Tr. 72). Dr. Jones Smith indicated that Dean was not significantly limited in the following: 1) ability to remember locations and work-like procedures; 2) ability to understand and remember very short and simple instructions; and 3) ability to understand and remember detailed

instructions.  (Tr. 72).  Regarding concentration and persistence, Dr. Jones Smith

indicated that Dean was not significantly limited in her ability to carry out very

short and simple instructions and only moderately limited in her ability to carry out

detailed instructions and maintain concentration for extended periods.  (*Id*.).  Dr.

Jones Smith listed Dean as moderately limited in her ability to interact

appropriately with the public.  (Tr. 73).  She also listed her as moderately limited in

her ability to respond appropriately to changes in the work setting.  (*Id*.).

### C.    The ALJ's Application of the Disability Framework Analysis

Under the Act, SSI is available only for those who have a "disability."  *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines

"disability" as the "inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  The

Commissioner's regulations provide that a disability is to be determined through

the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . .
> physical or mental ability to do basic work activities," benefits
> are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Dean was not disabled under the Act.  (Tr. 12-23).  At Step One, the ALJ found that Dean had never engaged in substantial gainful activity.  (Tr. 14).  At Step Two, the ALJ found that she has the following severe impairments: "bipolar disorder, autism spectrum disorder, posttraumatic stress disorder, panic disorder without agoraphobia, anxiety disorder, attention deficit hyperactivity disorder, and organic

mental disorder." (*Id.*).  At Step Three, the ALJ found that Dean's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 15-16).  In support of this finding, she cited Dean's Function Report, in which Dean answered standard questions about her abilities, and stated she is "pretty good" at following written instructions.  (Tr. 259).  She also noted that Dean graduated from high school and was able to give her medical history at her hearing.  (Tr. 15).  The ALJ also pointed out that Dean takes public transportation once a month, goes to church almost every Sunday, socializes twice a year with friends, and ice skates.  (*Id.*).  She also noted that Dean cared for her own personal hygiene; can prepare simple meals; pay bills and take public transportation.  (*Id*).  Therefore, the ALJ found she had moderate mental limitations that did not meet the criteria of Listings 12.02, 12.04, 12.06, 12.10 and 12.15.  (Tr. 15).

The ALJ then assessed Dean's RFC, concluding that she could perform a full range of work at all exertion levels, with the following limitations: "simple, routine and repetitive tasks in a low stress environment, defined as having only occasional decision making and occasional changes in the work setting;" "no interaction with the public and only occasional interaction with coworkers;" "no production rate or pace work."  (Tr. 26).

At Step Four, the ALJ found that Dean had no past relevant work.  (Tr. 21). At Step Five, the ALJ determined, based in part on testimony provided by the vocational expert in response to hypothetical questions, that Dean could perform the jobs of custodian (1,500,000 jobs nationally), dishwasher (1,500,000 jobs nationally), and laborer (1,353,000 jobs nationally).  (Tr. 22).  As a result, the ALJ concluded that Dean she was not disabled under the Act.  (Tr. 23).

### D.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted).   Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

### E.    Analysis

In her motion for summary judgment, Dean argues that the ALJ's decision at Step Three, and the resulting RFC is not supported by substantial evidence. Because the Court finds, for the reasons stated below, that the ALJ's determination of Dean's RFC is not supported by substantial evidence, it will limit its analysis to

that issue.

A claimant's RFC is defined as "the maximum degree to which [she] retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).[1] "In formulating a residual functional capacity, the ALJ evaluates all relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions." *Eslinger v. Comm'r of Soc. Sec.*, 476 Fed.Appx. 618, 621 (6th Cir. 2012) (citing 20 C.F.R. § 404.1545(a)(3)). The ALJ must also take into consideration "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

Moreover, an RFC is not supported by "substantial evidence" if it is the product of a selective discussion of the evidence that does not adequately demonstrate that the ALJ fairly weighed the competing record evidence. "'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record

---

[1] *See also*, Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996) (a claimant's RFC represents her ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule").

fairly detracts from its weight.'"  *Trudell ex. Rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) (quoting *Garner*, 745 F.2d at 388).  *See also Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 640-41 (6th Cir. 2013).  ("a substantiality of evidence evaluation does not permit a selective reading of the record.").

Here, the ALJ found that Dean had the RFC to perform a full range of work at all exertion levels, with the following limitations: "simple, routine and repetitive tasks in a low stress environment, defined as having only occasional decision making and occasional changes in the work setting;" "no interaction with the public and only occasional interaction with coworkers;" "no production rate or pace work." (Tr. 26).  Based on the above standards, the Court finds that the ALJ's analysis leading to this RFC is not supported by substantial evidence.

The ALJ gave little weight to the opinions of Dean's treating physicians and other medical providers, and discounted other aspects of the medical records that were in Dean's favor.  Overall, the ALJ's decision and analysis of the opinions and medical records from many of these doctors and other providers fails to demonstrate the type of weighing and reconciling of the evidence required for the Court to be able to conclude that the RFC is supported by substantial evidence.

i.    *Dr. Maltz*

The ALJ assigned "little weight" to Dr. Maltz's opinion that Dean "would

qualify for social security disability." (Tr. 19). The Court recognizes that "the determination as to whether the claimant is disabled is reserved for the Commissioner," and it has no quarrel with the weight given by the ALJ to that singular statement. *See* 20 § C.F.R. 416.927(d). However, while a physician – treating or otherwise – cannot make the ultimate determination regarding disability, an ALJ still must fairly weigh that doctor's treatment and examination notes and other records in arriving at the claimant's RFC. As it relates to Dr. Maltz, the ALJ erred in this respect.

As set forth above, Dr. Maltz examined Dean on May 30, 2014, concluding that her communication, socialization, and daily living skills were *far below* her cognitive ability. (Tr. 356). Specifically, Dr. Maltz noted, "[t]here was a clear discrepancy between [Dean's] cognitive levels and her adaptive functions. While her cognitive levels fell in the low average to average range with some borderline functioning, her adaptive measures fell ***at or below the first percentile*** revealing a ***discrepancy between her adaptive functions and her cognitive abilities***." (*Id.*) (emphasis added). Dr. Maltz continued, "[t]his discrepancy is not atypical in individuals with Autism since they have problems applying their cognitive abilities to daily living expectations. [Dean's] ability to adapt will need to be reviewed in the context of her age equivalents ***and not*** her cognitive abilities. While [Dean] has been able to achieve in school at a level consistent with her age, indicating by school

standards that she did not require services, [Dean] is very vulnerable . . ."  (Tr. 356-57) (emphasis added).  Later in his report, Dr. Maltz wrote, "[Dean's] adaptive measures fell significantly below her intellectual capabilities . . . [Dean] will have difficulty applying her cognitive abilities to daily living.  She is very vulnerable.  She is naive and she will be prone to being taken advantage of.  She will be incapable of appreciating the intent of others.  . . . Her social developmental levels are falling in the latency years, far below her chronological and what may be expected given her cognitive levels.  Consequently, she may appear more sophisticated and capable than is  true."  (Tr. 357).  Dr. Maltz also found that Dean had "[a] *marked* impairment in pragmatics or the ability to sustain or engage in reciprocal conversations with others," and "preoccupation with a specific interest that is abnormal in intensity and focus" and "[d]ifficulty with change." (Tr. 358) (emphasis added).

There are at least two problems with the ALJ's handling of Dean's findings.  First, while the ALJ did note that Dr. Maltz's records reflected Dean's "inconsistent responses to sensory stimulation, pervasive [sic] motor mannerisms, difficulty engaging others and problems with pragmatics," she characterized Dr. Maltz's findings as merely reflecting "some limitations."  (Tr. 18).  In light of the foregoing, that seems to significantly understate Dr. Maltz's actual findings.  Second, the ALJ relied heavily on the fact that Dr. Maltz found Dean "had average

verbal skills; she demonstrated at least average academic levels, and she obtained a Full Scale IQ score [of] 80 on the Wechsler Adult Intelligence Scale-IV," writing specifically that this demonstrated her "ability to perform the functions contained within the RFC." (*Id.*).  But in making this connection, the ALJ ignored that one of the central themes of Dr. Maltz's report was that none of those were good markers on which to evaluate Dean's actual functional abilities.  (Tr. 18, 356-58).  Thus, the ALJ's reasoning is not supported by substantial evidence.

*ii.    Dr. Gholami*

The ALJ noted Dr. Gholami's role in Dean's medication reviews and medication cocktails.  (Tr. 19).  Elsewhere in the decision, she cites Dr. Gholami's treatment notes for her conclusion that Dean had "issues with compliance [with medication] and noted improvement in symptoms when [Dean] was on verses off medication."  (Tr. 18).  This brief statement regarding Dean's failure to take all of her prescribed medications all of the time does not address one of the most serious problems in the treatment of mental illness – the side effects of such medications.

The Sixth Circuit has held that an ALJ's failure to make any findings as to the side-effects of medication is an error requiring remand.  *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) (quoting 20 C.F.R. 416.929(c)(3)(i)-(vi)).   Moreover, hypothetical questions to vocational experts must account for medication side effects.  *See White v. Comm'r Soc. Sec.*, 312 F.

App.x 799, 789-90 (6th Cir.).

The ALJ in this case did not consider the side effects of Dean's medications appropriately.  She only mentioned the side effects of Dean's medications in one brief sentence: "The claimant also indicated that her medications cause the side effect of drowsiness."  (Tr. 17).  However, the record indicates that Dean takes, or at various times has taken, many medications, including but not limited to: Trileptal, Effexor, Lithium, Adderall, Remeron, Concerta, Titrate Lexapro, quetiapine, Escitalopram, Quetiapine Fumarate, Ability, Trazodone, Vistaril, Aripiprazole, Bupropion Hydrochloride, Ranitidine HCI, Viibryd, Risperdal, and Rexulti, and that her doctors were frequently changing medications, or adjusting the dosages, in an attempt to find a combination that would work for Dean.  (Tr. 354, 589, 475, 482, 422-23, 477, 491, 502, 506, 637).  The ALJ's one brief sentence as to the side-effects of this medication, and her apparent discrediting of Dean due to her purported "compliance" issues, without more thoroughly analyzing those issues, does not satisfy the "substantial evidence" standard discussed above.  (*See e.g.*, Tr. 500 ("She reports discontinuing Abilify because it made her tired leading to an increased need to nap."); Tr. 510 ("Was on Risperidone but she slept too much so asked to be taken off."); Tr. 504 ("She discontinued Viibryd because she feels it makes her nauseous.")).

### iii.     Dr. Dumlao

Dr. Dumlao of Bay Arenac Behavioral Health treated Dean for eight months. (Tr. 473-508). The ALJ's decision focuses on only the portion of Dr. Dumlao's medical records that supports her conclusions while failing to adequately address other significant record evidence which detracts from those conclusions. For example, the ALJ noted that, after her October 2015 suicide attempt, Dr. Dumlao described her as "much calmer with a much less depressed mood, and no thoughts of suicide or sense of hopelessness." (Tr. 18). Indeed, as noted above, at several visits, Dr. Dumlao reported Dean illustrated good judgment, good recall, less depression, euthymic moods, motivation and drive. (Tr. 474, 481, 482). But, at many of these same visits, Dr. Dumlao also noted increasingly depressed mood with severe insomnia, crying spells, poor appetite, weight loss, anxiety, stress, flat affect and fatigue. (Tr. 473, 474, 481, 477). Moreover, during this time frame, Dr. Dumlao was trying numerous medications, at ever-increasing doses, without success. (Tr. 473-508). Again, the ALJ appears to have relied on certain fragments of the record supporting her RFC, while failing to meaningfully weigh that evidence against other significant competing evidence in the very same records.

### iv.    Caryn Schutte, M.A., L.L.P.C.

On January 12, 2017, Caryn Schutte, M.A., L.L.P.C., examined Dean for a medical source statement. (Tr. 534-36). She found that Dean had **extreme**

impairments in her ability to understand, remember and carry out simple instructions, and make judgments on simple work-related decisions.  (Tr. 534) (emphasis added).  She also noted that Dean would be off task more than 20% of the work day.  (Tr. 535).  In addition, she stated that Dean would have ***marked*** impairments in the ability to interact with the public, supervisors and co-workers.  (Tr. 535).  She also indicated that Dean would miss four or more days a month of work for symptoms from her mental impairment.  (*Id.*).

The ALJ assigned Schutte's opinion "little weight" because (1) they had a relatively short three-month treating relationship, (2) Schutte failed to cite objective medical evidence to support the extreme and marked limitations she found, and (3) Schutte's opinion is contradicted by Dr. Ibrahim's treatment notes which found Dean had "fair to good' insight in December 2016.  (Tr. 20).

But the Sixth Circuit has made clear that it is not unreasonable to rely on a claimant's subjective reports of panic and depression when there is an objectively corroborated underlying mental condition.  *See Blankenship v. Bowen*, 874 F.2d 1116 (6th Cir. 1989) ("Considering these objectively established medical conditions in combination, it is not unreasonable that the subjective symptomology also considered in combination exists to the extent alleged.").  Indeed, sometimes these are the only reports to rely on when diagnosing and treating mental illness. *See Ferrando v. Comm'r Soc. Sec.*, 449 Fed. Appx. 610, 612 (9th Cir. 2011).  The

ALJ should have considered Schutte's findings in light of the overall evidence regarding Dean's objectively corroborated mental impairments.

The ALJ also assigned Schutte's medical source statement "little weight" because it is contradicted by Dr. Ibrahim's treatment notes that described Dean's "insight and inclement as fair to good in December 2016." (Tr. 20). While it is true that some aspects of Schutte's findings conflicted with others found by Dr. Ibrahim around the same time, Dr. Ibrahim's assessment of Dean was more mixed than the ALJ recognized. (Tr. 531). Indeed, in the very document the ALJ cites to support her statement that Schutte's opinion contradicts Ibrahim's assessment of Dean, Dr. Ibrahim noted that Dean "continued to complain of anxiety, she consented for increasing BuSpar to 10 mg p.o. b.i.d., says she felt over medicated with Latuda, she consented for lowering the dose to 40 mg, she continued to [s]how significance [sic] mood symptoms." (*Id.*). Dr. Ibrahim also noted that Dean "has increased psychomotor tone, mood is anxious, affect is labile . . ." (*Id.*). He also adjusted her medications to match Dean's complaints. (Tr. 532). And, just a few weeks earlier, Dr. Ibrahim found Dean "has psychomotor agitation, mood is anxious and angry, affect is labile, speech is normal, says she sees shadows at times . . . attention and concentration is decreased . . ." (Tr. 517).

For these reasons, the Court cannot say that the ALJ's analysis of Schutte's opinion is supported by substantial evidence.

*v.*     *Jennifer Gavrila, MSW, LLMSW*

On July 5, 2017, Gavrila issued a written opinion in which she opined that

Dean had marked impairments in her abilities to 1) understand, remember or apply

information; 2) interact with others; 3) concentrate, persist or maintain pace; and 4)

adapt or manage oneself.  (Tr. 640).  She also stated that Dean would be off task

more than 20% of the work day.  (Tr. 641).  She also indicated that Dean had

marked impairments in understanding what to do, concentrating on a task, being

able to engage in the task around others, and keeping self-control.  (*Id.*).  Lastly,

she indicated that Dean would miss work four days or more a month due to the

symptoms of her disability.  (*Id.*).

The ALJ gave this opinion little weight, explaining:

> First, Ms. Gavrila is not an acceptable medical source under the
> regulations.  Second, Ms. Gavrila has only treated the claimant
> for a five-month period, and her opinion fails to cite any
> treatment notes or other objective medical evidence to support
> the degree of limitation alleged by her.  Third, Ms. Gavrila's
> opinion is inconsistent with the treatment records, which reflect
> some improvement with prescribed medications.

(Tr. 20) (citations omitted).

The ALJ's first reason is consistent with the law.  20 C.F.R. § 416.927(c)(2)

(providing a list of "acceptable medical" sources that does not include licensed

social workers).   However, Social Security Ruling 06-03p clarifies the fine

distinction made between "acceptable medical sources," "acceptable sources," and

31

"medical sources," and indicates that records from the latter should still be properly considered as part of the ALJ's overall evaluation of the record.  *See* 20 C.F.R. § 416.913(a); S.S.R. 06-03p.  When considering opinions of "other sources" such as Ms. Gavrila, the ALJ "generally should explain the weight given to [them] or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." S.S.R. 06-03p.

With these standards in mind, the Court finds that the ALJ's second two reasons for giving Gavrila's opinion little weight are not supported by substantial evidence.  While Gavrila may not have explicitly cited her treatment notes and objective medical evidence on the actual medical source statement, she did reference the fact that she had been treating Dean since February 2017 (Tr. 642), and noted that Dean's "symptoms", which affected her "nearly every day," included "problems with communication, stereotypical behavior of autism, . . . severe problems maintaining focus, attention and completing tasks . . ."  (Tr. 64). Ms. Gavrila and Dean drafted a treatment plan together on April 13, 2017, and Gavrila measured Dean's progress toward her goals in that plan.  (Tr. 629-38). Likewise, in treatment notes from May 4, 2017, Gavrila writes: "Client is making little progress.  She no longer lives with her mother; however, the toxicity

continues through text message and phone calls.  She continues to have immense guilt about her daughter's early birth." (Tr. 623).  Moreover, as discussed herein, numerous notes of Drs. Maltz, Gholami, Dumlao, Ibrahim and others at least arguably support Gavrila's finding of marked impairment in the ability to concentrate, persist or maintain pace, and to adapt and manage oneself.  (Tr. 352-59, 361-64, 542-63, 473-84, 477-519, 509-34).  Without an even weighing of the competing evidence in the record, the Court cannot find that the ALJ's analysis on this issue is supported by substantial evidence.

### vi.     *Barbara Jones Smith, Ph.D.*

Finally, the Court turns to the one opinion to which the ALJ gave "great weight" – that of Barbara Jones Smith, Ph.D., who evaluated Dean's medical records for an agency disability determination on January 8, 2016.  (Tr. 20, 66-77). The Commissioner correctly points out that opinions from non-examining state agency psychologists "may be entitled to significant weight, because these individuals are 'highly qualified' and are 'experts in Social Security disability evaluation.'" *Cobb v. Comm'r of Soc. Sec.*, No. 12-2219, 2013 WL 5467172, at *5 (N.D. Ohio Sept. 30, 2013) (quoting 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).  Indeed, "'[i]n appropriate circumstances, opinions from State agency medical and psychological consultants … may be entitled to greater weight than the opinions of treating or examining sources.'" *Brooks v. Comm'r of Soc.*

33

*Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013) (quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996).

Here, however, the reasons articulated by the ALJ for crediting the opinion of Dr. Jones Smith over all of the other treating and examining sources are not supported by substantial evidence.   First, the ALJ afforded this opinion great weight because it is "generally consistent with the treatment records and the claimant's recitation of her activities of daily living."   (Tr. 20).   But, for the reasons set forth above with respect to the other treating and examining sources, the Court cannot say that the ALJ's statement is supported by substantial evidence.

Additionally, Dr. Jones Smith's opinion was issued in January 2016, whereas much of the record – including numerous records that appear to contradict Jones Smith's opinion – came later in time.   (Tr. 473-639).   Specifically, at the time Drs. Jones Smith rendered her opinion, the record contained no evidence from Drs. Dumlao or Ibrahim.   (*Id*.).   Likewise, it did not contain the opinions or notes of therapists Gavrila or Schutte.   (Tr. 66-77).   Simply put, particularly where the Court cannot say that substantial evidence supports the ALJ's handling of the records related to many of those other medical sources, nor can it say that substantial evidence supports the ALJ's decision to assign "great weight" to Dr. Jones Smith's earlier medical opinion.

*vii.    Summary*

34

The law is clear that an ALJ does not fairly discharge her duties when she fails to discuss significant contradictory portions of the medical records.  *See Minor v. Comm'r of Soc. Sec.*, 2013 WL 264348, at \*17 (6th Cir. Jan. 24, 2013); *Roberts v. Colvin*, 2015 WL 181658, at \*10 (E.D. Mich. Jan. 14, 2015) (noting that while ALJ need not discuss all record evidence, "the quality and volume of evidence not discussed by the ALJ may 'raise[] serious doubts about the supportability of the ALJ's RFC finding' and overall conclusions") (quoting *Wilcox v. Comm'r of Soc. Sec.*, 2014 WL 4109921, at \*7 (E.D. Mich. Aug.19, 2014)).  For all the reasons set forth above, the Court cannot find that the ALJ's RFC determination is supported by substantial evidence.  Accordingly, remand is warranted.

## III.   CONCLUSION

For these reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment (**Doc. #21**) be **DENIED**, Dean's Motion for Summary Judgment (**Doc. #13**) be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

Dated: August 2, 2019                          s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                                          United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to

their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 2, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager